UNITED STATES, Appellee

v

WILLIAM A. PRICE, Airman First Class,
U. S. Air Force, Appellant

17 USCMA 566, 38 CMR 364

No. 20,838

May 24, 1968

*Lieutenant Colonel Leonard Eichner* argued the cause for Appellant, Accused. With him on the brief was *Colonel Dwight R. Rowland.*

*Major Robert L. Bates* argued the cause for Appellee, United States. With him on the brief was *Colonel James R. Thorn.*

## Opinion of the Court

KILDAY, Judge:

Appellant was arraigned before a general court-martial convened at Tan Son Nhut Air Base, Republic of Vietnam, charged with three specifications of violation of a lawful general regulation, in violation of Article 92, Uniform Code of Military Justice, 10 USC § 892. He pleaded not guilty but was found guilty of two of the specifications and sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for one year. Intermediate reviewing authorities affirmed the findings and sentence. The case is before this Court upon certification by the Judge Advocate General of the Air Force on the following issue:

"WAS THE BOARD OF REVIEW CORRECT IN HOLDING THAT THE SEARCH ON 18 FEBRUARY WAS LEGAL.?"

A résumé of the factual situation as disclosed by the record is necessary to place the certified question in the proper framework.

The appellant, who lived off base in Saigon, was suspected of black-market dealing in greenbacks and Military Payment Certificates, denounced by a general regulation. Airman Sarja, a member of appellant's organization, was recruited by agents of the Office of Special Investigations to assist them, as an undercover agent, in making a case against Price. Airman Sarja testified that after establishing a friendly relationship with the appellant, he asked him about his financial dealings and the manner in which they were conducted. The appellant agreed to show him how it worked and on the following day, February 15th, they proceeded to a nearby U. S. Army camp. There the witness observed the appellant soliciting two members of

the Army, who were leaving the country for a period of rest and recreation, to exchange Military Payment Certificates into dollars for him.[1] He gave each of them a quantity of MPC's and arranged for a subsequent meeting. According to Airman Sarja, the appellant, in response to his inquiry, stated he had given each man the equivalent of $1,900.00 in MPC's. At the later meeting, the witness observed the two soldiers hand something to the appellant which he assumed was U. S. currency. They then departed from the camp and returned to Price's apartment. The latter informed Airman Sarja that he had given the soldiers $100.00 for their assistance. Thereafter, the witness reported this event to the OSI.

According to the witness' further testimony, Price desired him to take over the operation at this particular camp and directed him to pick up $4,000.00 in MPC's at his apartment the next day. He did so, took them to the OSI office, where a story was made up as to why he had been unable to exchange them, and then returned the MPC's to the appellant. Two days later on February 18th, at the direction of the OSI, Airman Sarja again picked up $4,000.00 in MPC's at the appellant's apartment and brought them to the OSI. There, according to a plan devised at a meeting on the previous evening between the witness and agents of the Office of Special Investigations and Criminal Investigations Detachment, the MPC's were changed into $4,000.00 in green currency. Following instructions, Airman Sarja returned to Price's apartment and gave the money to him. As they were counting the money, the apartment was raided and this and other green currency was seized.

[1] While there was no maximum limit set, Army personnel leaving the country were authorized to exchange Military Payment Certificates into green currency at least in the amount of $2,000.00.

An OSI agent testified by deposition. He related that the OSI had been informed by the Army CID that the appellant was suspected of dealing in the exchange of money at a particular rest and recreation center. A plan was developed for cooperation in an investigation of the appellant's activities. Subsequently, the agent received information from Airman Sarja that the latter had seen a large amount of MPC's and green currency at the appellant's off-base quarters. He *suspected* that the appellant might have U. S. currency at his apartment. Acting on this information, he obtained permission, on February 16th, from the Base Commander to search the person of the appellant and the premises located at a specified address in Saigon. The search was conducted on February 18th by two CID agents and Vietnamese police. The deponent admitted that prior to the search he and another OSI agent gave $4,000.00 in green currency to his informant with instructions to take it to the appellant at his residence and to signal the investigators when he had completed his mission. The agent contended in his deposition that the search was conducted by the Vietnamese. He did not take part therein or enter the apartment until it was all over and did not show the appellant the authority to search or inform him that he had a warrant. The money ($8,515.00, in U. S. currency) was confiscated by a Vietnamese inspector and the agent observed a receipt therefor being given to a girl named Lillie. It was in Vietnamese and, according to the agent, the appellant refused to accept anything he could not read although it was translated by an OSI interpreter as well as a Vietnamese interpreter.

Specifically, the appellant was charged with violating the above-identified regulation by having in his possession, on February 15th, $3,800.00, and, on February 18th, $8,515.00, all in U. S. currency. Whether the amount seized, on the 18th, included that which he allegedly possessed on the 15th, is not shown by the record. However, the two specifications were not considered as multiplicious for purpose of sentencing.

At trial, defense counsel objected to testimony as to the results of the search on the ground that there was an insufficient showing of the existence of probable cause for the issuance of the authorization to search by the Base Commander. The Government contended initially that this was a foreign search conducted by Vietnamese authorities, and, secondarily, that the search was properly authorized by appropriate American authority. After hearing testimony by a Vietnamese inspector as to the part he played in the search and from the Base Commander, the law officer overruled the defense objection.

Before the board of review, appellate defense counsel asserted that the law officer erred in his ruling. The board did not discuss the merits of the Government's contention that this was a foreign search conducted by the authorities of the country in which the property was located and under their law, but rather held that the search was lawful, based on a finding that the commander had reasonable and probable cause to authorize the search. At this level, the contentions of the prosecution and the defense are the same as those maintained at trial.

In support of its contention that this was a Vietnamese search, the Government, at trial, presented the following testimony of Inspector Thanh of the Judiciary Section of the Municipal Police:

"Q [TC]. Inspector I would like to direct your attention to 18 February 1967 and I ask you if you had occasion to become concerned with Price, the accused. On 18 February did you see Airman Price?

"A. Yes sir.

"Q. What was the nature of that, what were the circumstances?

"A. It was that one OSI Agent who came to our station and to request us to cooperate with him to make a search of one airman's house.

"Q. Was this Airman Price's house?

568

"A. Yes.

"Q. And did he relate to you what the purpose for the search was?
"A. Yes he did.

"Q. Please relate to the court?
"A. He said that Airman Price make blackmarket with green and MPC and American dollars.

"Q. By American dollars sir, you are referring American US Green Currency? By American dollars, do you mean greenbacks, United States Green Currency?
"A. Yes.

"Q. Green currency?
"A. Yes.

"Q. Not MPC?
"A. We entered and some MPC too. The American in the army, he can use MPC but not green.

"Q. Is possession of green currency, American green currency a violation of Vietnamese law?
"A. The possession is not violation of law but to make blackmarket is a violation of law.

"Q. Under these circumstances then, are you authorized to conduct a search?
"A. Yes.

"Q. As an Inspector of the Judiciary Section?
"A. Yes.

"Q. Did you then go to Airman Price's apartment?
"A. Not that time. First we go to the OSI office.

"Q. And from there did you go to the apartment?
"A. Yes.

"Q. And what happened at the apartment?

"IDC: Objection. Mr. Law Officer, the evidence that the witness is going to testify is what we contend to be an unlawful search and seizure.

"LO: Do you wish to present argument at this time?

"IDC: Yes sir we do.

"LO: Very well, the court will be closed."

After hearing argument of counsel, during which trial counsel alluded to the fact that a search warrant had been issued by the Base Commander, the law officer requested that the Commander be called to testify. When he had heard the latter's testimony, which will be discussed hereinafter, and further argument of counsel, the law officer overruled the defense objection. He did not, as pointed out by appellate Government counsel, indicate whether he based his ruling on the premise that the search was Vietnamese or American.

The record is devoid of any information relative to the Vietnamese law applicable to search and seizure, with the exception of the inspector's affirmative reply when asked whether he was authorized to search under the circumstances relayed to him by OSI and/or CID agents. The Government, in arguing the validity of the use of the fruits of the search, quotes from our opinion in United States v DeLeo, 5 USCMA 148, 155, 17 CMR 148, wherein we stated that:

". . . It is a well-established rule of Federal law that the Government may use evidence obtained through an illegal search effected by American state or by foreign police—*unless Federal agents participated to some recognizable extent therein.* United States v Haywood, 208 F2d 156 (CA7th Cir); Johnson v United States, 207 F2d 314 (CA 5th Cir). Cf. United States v Volante, 4 USCMA 689, 16 CMR 263." [Emphasis supplied.]

In *DeLeo,* we found the search to be exclusively a French search—it was initiated by a French inspector and the motive for its existence emanated wholly from the French police—with the American agent's presence a no more than incidental element.

Here, the evidence is to the contrary. Not only did the American authorities instigate the investigation and the search, but the Vietnamese inspector testified that an OSI agent "came to our station and to request us *to cooperate with him to make a search* of one airman's house." (Emphasis sup-

plied.) See Byars v United States, 273 US 28, 71 L Ed 520, 47 S Ct 248 (1927). The situation in the case at bar is analogous to that which pertained in United States v Rogers, 32 CMR 623, where a joint search of Roger's apartment was conducted by German and American authorities after the accused's wife was arrested in a nearby bar, known as the "Jazz Keller," in possession of untaxed American cigarettes. The German customs inspectors testified that no additional authority to search was needed in such circumstances. The Government contended that since probable cause for the search existed under Federal laws of the United States, it was irrelevant whether the search was conducted by the German authorities as their own venture, or by the German authorities as agents for the American authorities, or as a joint venture by the authorities of both nations. The board of review, before considering the existence of probable cause to search under United States law, noted that,

> ". . . since no formal proof of pertinent German law was adduced in evidence such law can not be recognized as criteria for determining the legality of the search at trial level or now, upon appellate review. Paragraph 147b, *Manual for Courts-Martial, 1951*, page 275; ACM S–12085, Coombs, 21 CMR 805." [*Id.,* at page 628.]

So, too, here. We hold, therefore, that there is insufficient evidence in the record to sustain a finding that the search in question was a Vietnamese search or that it was validly conducted under the laws of that country.

Turning then to the question of whether the board of review was correct in determining that there was probable cause for the authorization to search granted by the Base Commander, we look next to that individual's testimony. Because of its importance, as it bears on this issue, we quote it in full:

"Questions by the prosecution:

"Q. Sir, would you state your name, your rank, organization and service?

"A. My name is Grover K. Coe, Colonel, 377th Combat Support Group.

"Q. What position do you occupy on this base Colonel Coe?

"A. My job is Base Commander.

"Q. As such sir, do you have occasion to authorize searches and seizures?

"A. Yes. I do not as a rule ever attempt to allow anybody else to sign them but me.

"Q. In other words . . .

"A. On occasion it may be but I don't like to delegate it.

"Q. Colonel Coe, I'd like to direct your attention to 16 February 1967 and ask if you had a conversation with Special Agent Paul of the OSI in reference to Airman Price?

"A. Well, I'd be not speaking the truth if I say that I remembered distinctly but I remember the name Price. I don't remember Hall to [sic] well but I remember Price. As I recall, Price was involved with the exchange of money at Camp Alpha I believe, I may be wrong, in the amount of $3,500.00 this one day, approximately that amount. When they asked me to sign the authorization for search and seizure I said well are you sure that there may be this money in his quarters off base. I said don't you have to have a member of the National Police go with you. Yes. I said okay. There was enough information that was provided me by the agent to lead me to believe that this may have been the type of a search that could be fruitful. That's the basis upon which I signed it.

"TC: Will the reporter mark this as Prosecution Exhibit #1 for identification please.

"(The reporter marked the document as requested.)

"Q. Colonel Coe, I show you Prosecution Exhibit #1 for identification, AF Form 1176, Authority to Search and Seize and ask sir if that is the authority you have testified about?

"A. The agents [sic] name was Paul, I do remember that. I thought you said Hall. Paul, I do remember him, he had a mustache as I recall and used to wax it on the end.

"Q. So when you signed that search warrant Colonel Coe, you believed in your mind that there was reasonable and probable cause to search the accused's off base quarters on the conclusion that he may be possessing contraband currency?

"A. Yes.

"TC: No further questions.

"LO: Do you have any questions?

"IDC: We have no questions of the Colonel.

"LO: The witness may be excused."

In United States v Ness, 13 USCMA 18, 22–23, 32 CMR 18, we said:

". . . a search based on a warrant is invalid if probable cause does not appear in the facts presented to the officer issuing the warrant. See Jones v United States, 362 US 257, 4 L Ed 2d 697, 80 S Ct 725 (1960); Johnson v United States, 333 US 10, 92 L Ed 436, 68 S Ct 367 (1948); United States v Brown, 10 USCMA 482, 28 CMR 48."

See also United States v Davenport, 14 USCMA 152, 33 CMR 364; United States v Hartsook, 15 USCMA 291, 35 CMR 263; United States v Soto, 16 USCMA 583, 37 CMR 203.

As we stated in Hartsook, supra, at page 294:

"While he issues no warrants, the commanding officer is bound by the same rules in authorizing a search as his opposite number [a Federal magistrate]; that is, probable cause to believe that the things to be seized are on or within the premises to be searched."

In the case at bar, the "warrant," Prosecution Exhibit 1 (Authority to Search and Seize), referred to by Colonel Coe, does not delineate the facts supplied to him which served as the basis for his belief that there was probable cause to believe that property to be seized (United States currency and excess amount of Military Payment Certificates and Vietnamese piasters) was then being concealed on the identified premises. He testified "There was enough information that was provided me by the agent to lead me to believe that this may have been the type of a search that could be fruitful." However, other than recalling being told that Price was involved in the exchange of some money ($3,500.00) at Camp Alpha, he was unable to recall or at least was not requested to amplify on this point. Even when considered together, the testimony of the commanding officer and the "warrant" do not contain sufficient data to substantiate the existence of probable cause as defined in the aforementioned cases. United States v Davenport, supra. However, since we are not restricted to a consideration of the written permission to search, but may consider the record as a whole to establish the extent of Colonel Coe's knowledge in this connection, we next look to the deposition of the OSI agent (Prosecution Exhibit 2), at whose request the authorization was granted. Here again the information appears to be only partially developed. The agent deposed that he requested the authorization based on information from Airman Sarja that the latter had seen Military Payment Certificates at the appellant's residence. He stated that this was legal, unless in excessive amounts, but furnished no authority for such a statement. He suspected there might also be United States currency there but this, admittedly, was only suspicion. "A search founded upon mere suspicion is illegal and the fruits thereof inadmissible." United States v Gebhart, 10 USCMA 606, 610, 28 CMR 172. See also United States v Brown, 10 USCMA 482, 28 CMR 48.

We are left then with the testimony of Airman Sarja, assuming that everything he knew was furnished to his OSI contact and through him to the commanding officer. The fact that the information was hearsay would not per se invalidate the warrant (Jones v United States, 362 US 257, 4 L Ed

**571**

2d 697, 80 S Ct 725 (1960); United States v Davenport, supra) "so long as a substantial basis for crediting the hearsay is presented" (Jones v United States, supra, at page 269), or the informant has a previous record of supplying "accurate and reliable" information. Draper v United States, 358 US 307, 313, 3 L Ed 2d 327, 79 S Ct 329 (1959). See also Costello v United States, 298 F2d 99 (CA9th Cir) (1962). The basic testimony of this *special employee* was summarized at the outset and therein he left no doubt that he was working for the military authorities with specific instructions to make a case against one individual— the appellant. Inasmuch as the knowledge of the OSI agent who requested the authority to search can be no greater than his source's and of a piece with that furnished to Colonel Coe, we are limited in our consideration to what he *knew*. As noted, he initially testified that he observed an exchange of green currency. On cross-examination, the following colloquy took place:

"Q [TC]. I'd like to direct your attention to the 13th of March, 13th of February 1967. You said that the accused took you out to Camp Alpha and you testified that you saw the accused hand two soldiers a package of money?

"A. Sir, you said the 13th.

"Q. What date was it that you went out?

"A. 15th.

"Q. Isn't it a fact that you testified that you saw the accused hand two soldiers a stack of money?

"A. Yes sir.

"Q. Approximately [sic] from the accused were you standing at that time?

"A. Let me clarify sir, you are talking about the MPC.

"Q. The MPC, that's correct?

"A. I was standing a few feet from them.

"Q. Did you actually see MPC?

"A. I don't follow you.

"Q. Did you actually know that that was MPC that he handed to the two soldiers?

"A. Sir, I saw him hand them two stacks, he told me it was MPC.

"Q. You actually didn't see it?

"A. I saw him hand them two stacks.

"Q. But you don't know what it was?

"A. It was MPC that Price told me.

"Q. What Price told you?

"A. Yes sir.

"Q. Now you further testified Sarja that day that you saw the accused in possession of Green?

"A. Yes sir.

"Q. Sarja, isn't it a fact that you never saw green, you only assumed that's what they were doing?

"A. Well, I was standing at the door, I could see them.

"Q. How far were you when they were transacting that, when they were in their conference, alleged conference?

"A. You mean in the hootch?

"Q. Where they were doing their business, what you testified to, how far were you from them?

"A. I was standing at the door, they were about three or four bunks down I guess.

"Q. Can you tell these gentlemen that standing from the door, they were three or four bunks, that you actually saw green?

"A. Sir, they were doing something down there, I assumed it was with green.

"Q. But you didn't see green, you only assumed it was green, isn't that a fact? Do you understand that you are testifying under oath?

"A. Yes I do.

"Q. I remind you again, do you understand that you are subject to perjury if you lie here on the stand. I'll go back and ask that question again. Isn't it a fact that you never actually saw green?

"A. Sir, I assumed that they were handling the green.

"Q. You assumed, did you see it?

"A. The actual green dollar bills, no sir.

"TC: Sarja, let me ask you just one question. Are you through?

"IDC: No.

"Q. Now Sarja, you testified that there were $4,000.00 somebody gave you that the accused gave you to go and exchange for green, is that correct?

"A. Yes sir.

"Q. Did the accused ever give you $4,000.00?

"A. I testified that the accused did . . . I didn't testify that the accused gave it to me, I said I picked it up from his apartment.

"Q. Was the accused there when you picked it up?

"A. No sir, he was not.

"Q. Why did you want to pick up that $4,000.00.

"A. Well, Price wanted me to learn the operation at Camp Alpha and I needed the money to learn the operation.

"Q. Isn't it a fact that the reason you picked up the money at Price's house was because the OSI Agent told you they wanted to find, get Price in the possession of some green?

"A. Yes sir, that's the idea.

"Q. That was the idea, you picked up the $4,000.00 so you could go and exchange it, bring it back so they could raid the apartment?

"A. Yes sir.

"Q. Now Sarja, isn't it a fact that at no time other than the time you brought that $4,000.00 of green that you ever saw green in the possession of the accused?

"A. Sir, I got [sic] go back to Camp Alpha, I saw him stuff it . . .

"Q. But did you see green, did you actually see it, did you actually see him put green?

"A. No sir, I assumed it was the green.

"Q. And isn't it a fact you at no time other than that one occasion when they had raided the apartment saw green in the possession of the accused?

"A. No sir.

"Q. That's not a fact? Are you saying . . . I'll repeat my question. Isn't it a fact that you have never other than that one exception, seen green in the possession of the accused?

"A. When you put it that way, no sir. I never seen it if you put it like that.

"Q. Do you have any suggestions as to how I should put it?

"A. No sir.

"Q. Now Sarja, what were your instructions from the OSI and CID, one or the other as to how to go about getting the accused in possession of green, what were your instructions, would you explain that to the court?

"A. You are referring to the day of the 18th sir.

"Q. I'm referring to the day of the 18th, that is correct?

"A. Sir, the $4,000.00 was exchanged at the base finance office. I took the $4,000.00 US Green to Price's apartment. They wanted that green, they wanted to make sure Price was in the apartment when I went in there and had that green.

"Q. So you never in fact took any green to Tan Son Nhut to exchange it. They took it down to base finance, agents of the government and exchanged it and gave it to you to carry it back to where Price stayed?

"A. Yes sir.

"Q. Would you please tell the court who exchanged that green?

"A. Special Agent Paul.

"Q. Who is that?

"A. Special Agent Paul of the OSI.

"Q. He is the same man that you were working with?

"A. Yes sir.

"Q. Had you ever prior to the day of the search told OSI or CID that you had seen Price in the possession of green?

**573**

"A. I told them the day of the 15th that he had green.

"Q. And you have stated here that you didn't actually see him with green on the 15th?

"A. Sir, at the time he was handling something down there.

"Q. It was something?

"A. Alright [sic] sir.

"Q. Has anyone told you that you ought to testify that you actually saw green when you're stating here you haven't, anyone ever tell you that's the way you ought to testify.

"A. No sir.

"Q. Why are you attempting to hide the truth here?

"A. I'm not attempting to hide the truth sir, we went out there to show me the operation, the idea was to change MPC to green, the two Army troops came back, they went down to the bunk there and they were handling . . .

"Q. And you assumed on the basis of that that they had green?

"A. Yes sir. I wasn't standing right over them, I was standing by the door.

"Q. So you didn't actually see it?

"A. No sir.

"Q. Now, the day of the search, that morning, what time did the search take place?

"A. Sometime in the afternoon sir, I don't recall the exact time.

"Q. When was the idea conceived for conducting a search of the accused's premises?

"A. The night before.

"Q. And who was involved in the planning of that search?

"A. The OSI and the CID. When you say search, I don't . . .

"Q. They weren't what, what were you going to say?

"A. We were formulating plans the night before. They were formulating plans right along what would be the best time to hit Price. You keep saying search, it wasn't necessarily a search that the OSI went in there, they wanted to catch Price with the $4,000.00 green.

"Q. So that's the basis you entered the premises on, to catch him with $4,000.00 in green?

"A. Yes sir, and if he had anything else they could come up with it. The main idea was the $4,000.00 in green.

"Q. Why didn't you conduct the search, why didn't you try and search or apprehend Price that night?

"A. Because the OSI wasn't sure that he had green in the house.

"Q. Nobody was sure as to what was in the house?

"A. No sir.

"Q. So you conceived a plan whereby you could get green in the house?

"A. Yes sir.

"Q. Now you have been testifying here Sarja that the accused, the idea, the conception came from the accused for you to get $4,000.00, the accused wanted to give you $4,000.00 so you could go out to Tan Son Nhut and run his business. Isn't it a fact that the reason you got that $4,000.00 was at your own insistence?

"A. Well it was my insistence to let Price know that I was working with him so that we could build up the case against him, if that's what you mean.

"Q. The next morning, before the 18th, the morning of the 18th, what time were you supposed to meet the OSI and CID Agents?

"A. Approximately 11:00 A.M.

"Q. What did you decide to do at that time?

"A. At that time, when I went back it was decided to take the money, it was decided the night before but when I went back, they took the money over to base finance and exchanged it to green.

"Q. Alright [sic], what happened after that?

"A. They then drove me down to CID Headquarters where it was decided to call in the Vietnamese National Police.

"Q. What time was this?

"A. I guess around noon time sir.

"Q. And why did you call the Vietnamese National Police?

"A. I didn't call them, I think the OSI called them because it was the legality of entering Airman Price's apartment.

"Q. Because you all wanted to enter an apartment, you called the Vietnamese to help you do it?

"A. Because it wasn't definite who was paying the rent or whose apartment it was. Price was living there.

"TC: I object to this line of questioning your honor. It is not within the witnesses [sic] domain to know the supposed technicalities of search and seizure and so forth."

There then followed a colloquy between counsel and the law officer which ended with the latter's ruling that defense counsel could not inquire further as to the witness' knowledge of the request for the assistance of the Vietnamese police.

Although our main concern is with the witness' *knowledge* at the time the authorization to search was granted, we've included his testimony relative to the events preceding the search because of its bearing on the main issue. It is at once apparent that regardless of what he might have told his OSI employer, the only green currency that the witness ever actually saw was that which was given to him by the OSI on February 18th. On the 15th, he *believed* he saw green currency or *assumed* that green currency was being exchanged because the appellant allegedly told him so. No further analysis is needed. This was patently mere suspicion and, as such, palpably insufficient to satisfy the requirements of probable cause for the granting of authority to search. Nathanson v United States, 290 US 41, 78 L Ed 159, 54 S Ct 11 (1933); United States v Brown and United States v Davenport, both supra.

We cannot leave this issue without expressing our concern over the anomaly of the situation presented here. The OSI agent deposed that on February 16th, when he requested permission to search, he felt there was probable cause to believe that green currency would be found in the appellant's apartment. He convinced the Base Commander thereof, as the latter so testified. If this be so, we are constrained to wonder why it was felt necessary to "plant," through an informant, an additional $4,000.00 in the suspect's apartment. Such a procedure can only serve to cast serious doubt on the original belief.

We hold, therefore, that the board of review was not correct in holding that the search on February 18 was legal.

At the time this issue was before the board of review, it also had for consideration an allegation that the law officer erred in admitting the appellant's pretrial statement on the ground that it was the result of an illegal search. In light of its holding, the board found that the search had no unlawful impact on the admissibility of this document. This holding and any others affected by the search should now be reconsidered.

The certified question is answered in the negative. The record of trial is returned to the Judge Advocate General of the Air Force for resubmission to the board of review. The board should take such action as is indicated not inconsistent with this opinion.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

If a friend tells me he is going to buy a watch and takes me to a jewelry store, where I observe him take something from his pocket, hand it to a salesperson and receive from that person a package, which he places in his pocket, then on leaving the shop, my friend tells me he bought the watch he had told me about, in my opinion, I have probable cause to believe he bought the watch and has it in his pocket. Substantially, the same situation is present in this case.

The evidence which justifies the conclusion that the accused probably had

**575**

green currency in his possession, in violation of appropriate regulations, and that this was imparted to the officer who issued the authorization to search can be summarized as follows:

1. The accused and Airman Charles A. Sarja were friends.

2. Camp Alpha Processing Center in Vietnam was used by Army personnel going on R&R (rest and recreation) out of the country. Regulations authorized use of Military Payment Certificates in Vietnam, but prohibited possession of United States green currency. Persons leaving Vietnam on R&R were allowed to exchange, without question, up to $2,000.00 in MPC's for green currency.

3. The accused told Sarja about his currency "business" at Camp Alpha, in which he exchanged MPC's for green currency. He invited Sarja to meet him on February 15, at the Main Gate of Tan Son Nhut, and they would go to Camp Alpha to see how the accused "did business." Sarja reported the invitation to Office of Special Investigations agents, and he was told to accept it and report the results of the visit to the agents.

4. Sarja met the accused as agreed, and the two proceeded to Camp Alpha. Over a cup of coffee at the snack bar at the Camp, the accused again explained his "operation" and told Sarja "to watch his actions" to learn how he performed. The accused left Sarja and approached two Army men at a nearby table. He engaged them in conversation. After a few minutes, he and the two soldiers left the snack bar. The accused "motioned" to Sarja "to follow." The accused and the soldiers went into an empty tent. Sarja watched them from the front of the tent "a few feet" away. He observed the accused hand each soldier a "stack" of money. The soldiers left the tent, and the accused rejoined Sarja. He told Sarja he had given each soldier $1,900.00, and was to meet them later at the Processing building.

5. Sarja and the accused went to the Processing building, but could not find the soldiers. They looked for, and finally found them. All four went into a building. The accused directed Sarja to stand watch by the door. He and the two soldiers went three or four bunks down and sat on a bunk. Sarja observed each soldier give the accused "something," which he "assumed" was green currency. The accused stuffed this into his pockets. He also saw the accused hand one of the soldiers something which, from "what . . . [he] could tell, . . . was green money." Then the soldiers left. The accused told Sarja that he had given "them $100.00 apiece." Sarja and the accused then went to the accused's apartment. Later that day, Sarja told Special Agent Ernest D. Paul that the accused had green money.[1]

6. On February 16, the accused indicated to Sarja that he wanted him "to run the operation" at Camp Alpha by himself. Sarja told the accused he had no money. The accused advised Sarja that he had $4,000.00 at his apartment and Sarja could use this money. Sarja "picked up" $4,000.00 in MPC's from the accused. He took the money to the Office of Special Investigations and they "made up . . . reports" on the matter. He then returned to the accused at his apartment with "some

---

[1] Agent Paul, who obtained the warrant to search, testified Sarja reported that "amounts of green money" had been "received by Airman Price." Although military law accords the accused the right to attack the truthfulness of the representations in an application for a warrant (United States v Ness, 13 USCMA 18, 23, 32 CMR 18), my reading of the record of trial convinces me that, while Sarja acknowledged at trial he did not see the color of the "something" turned over to the accused by the two soldiers, he still honestly believed it was green currency. He had, as the text indicates, abundant reason to believe such currency was involved in the transaction.

kind of a story . . . [as to] why . . . [he] didn't change the money."

7. On February 16, Special Agent Paul went to Colonel Grover K. Coe, the Base Commander, and informed him of the accused's transaction at Camp Alpha. Colonel Coe testified he was advised of the transaction, and received "enough information" about the accused to convince him that there was probable cause to search his quarters for "contraband currency." Accordingly, he issued authorization for the search. It may be fairly inferred from Coe's testimony that the information he received included the accused's admissions to Sarja as to his currency "business."

I am also satisfied that the search conformed to the law of the Republic of Vietnam. Mr. Lieu Phuoc Thanh was, in my opinion, competent to testify as to the Vietnamese law on search and seizure. See my opinion in United States v Carter, 16 USCMA 277, 288, 36 CMR 433. Mr. Thanh was an Inspector of Municipal Police, with twenty-two years of police experience. At the time of the trial, he was assigned to the Judiciary Section. He testified he was informed by the Office of Special Investigations that the accused was engaged in black-market transactions with United States green currency.[2] Such transactions violated Vietnamese law. In "these circumstances" he was, as an Inspector, "authorized to conduct a search."

Even if we assume the search was illegal, I must still disagree with the majority. In my opinion, the admission in evidence of the results of the search could not possibly have prejudiced the accused as to the specification of the original charge.

Six days after the search, the accused made a full and voluntary confession to the effect that on February 15, he exchanged MPC's for green currency at Camp Alpha in the manner described by Sarja. The evidence demonstrates beyond all doubt that this confession was not the product of the illegal search. It was made after the accused had consulted with counsel on a number of occasions and had determined he could, as counsel suggested, "bargain himself into a considerably better position with reference to the offense that he was charged with." The accused admitted that, after he was apprehended in connection with the original charge, he told Agent Harding W. James of the Criminal Investigations Detachment that he would work with him to "uncover the rest of this big organization that was operating out of Camp Alpha." He also admitted he went to work for the Criminal Investigations Detachment on that project on February 22, two days before he made his confession. Agent James, testifying for the defense, stated that the accused "sent . . . word" he wanted to talk to him. When he met with the accused, the accused "volunteered to help develop" information as to other persons engaged in money transactions at Camp Alpha. According to James, the accused "was desparately [sic] seeking if anyone in the military could help him that he would not receive a dishonorable discharge." He informed the accused that if "he wanted to proceed with the help that he could render, it would be appreciated," but all that he, James, could do was "testify in his defense." The accused agreed to cooperate and worked with Agent James from February 22 to early April. Since the confession was totally unaffected by the results of the search, it was properly admitted in evidence. United States v Ball, 8 USCMA 25, 23 CMR 249. With the confession, the evidence as to the accused's illegal possession of green currency on February 15 is so compelling that the court members could not possibly have been influenced in their findings of guilty as to this offense by evidence of the discovery of green currency in his apartment on February 18. United States v Wimberley, 16 USCMA 3, 8,

---

[2] The evidence clearly indicates that the information he received dealt with Sarja's account of the Camp Alpha transaction.

36 CMR 159. At the very least, therefore, I would affirm the findings of guilty of specification 1 of the charge, and return the record of trial to the board of review for reassessment of the sentence.