UNITED STATES, Appellee,

v.

**Jack A. SCHNELL, Private U.S. Army, Appellant.**

No. 29,373.

U. S. Court of Military Appeals.

June 27, 1975.

---

*Captain Raymond R. Froelich, Jr.,* argued the cause for Appellant, Accused. With him on the brief were *Colonel Victor A. DeFiori* and *Major Richard J. Goddard.*

*Captain James R. Anthony* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Ronald M. Holdaway, Lieutenant Colonel Donald W. Hansen, Captain Richard S. Kleager,* and *Captain David A. Schlueter.*

1. The CID agent's statement was dated November 27, 1972. In material part, it recited that a confidential informant had seen drugs in the accused's room and that the accused had told him he was going to sell them "the next payday," which was on November 30. Other evidence provided a substantial basis for a belief that the informant was reliable, but no facts on that point appear in the statement presented to the German judge. *See United States v. Vasquez,* 22 U.S.C.M.A. 492, 47 C.M.R. 793 (1973).

**OPINION OF THE COURT**

COOK, Judge:

Accused challenges his conviction by general court-martial for wrongful possession of prohibited substances, on the ground that evidence admitted against him was obtained in an illegal search.

The search was of a room rented by the accused in civilian premises in Ansbach, Federal Republic of Germany. It was conducted on November 28, 1972, by the German police, on a warrant issued by a German magistrate on information furnished by an Army Criminal Investigation Detachment agent which complied with German law but would have been insufficient to justify issuance of an American search warrant.[1] Defense counsel objected to evidence seized in the search, but the objection was overruled on the ground that German law controlled, and there was no involvement in the search by American enforcement agents.[2]

Appellate defense counsel argue that American standards must be satisfied to justify the use in an American court of evidence obtained in a search by foreign police. The argument is predicated on *Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), and would require that we overrule our earlier holding in *United States v. DeLeo,*[3] that evidence obtained in a search in a foreign country conducted exclusively by police officers of that country, in accordance with local law, is admissible in a court-martial, notwithstanding the search does not comport with United States constitutional standards.

In *Elkins,* the United States Supreme Court overruled what was known as the "silver platter" doctrine. Under that doc-

2. *See United States v. DeLeo,* 5 U.S.C.M.A. 148, 155, 17 C.M.R. 148, 155 (1954). *Cf. Lustig v. United States,* 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949), and *United States v. Callaway,* 446 F.2d 753 (3rd Cir. 1971).

3. 5 U.S.C.M.A. 148, 155, 17 C.M.R. 148, 155 (1954).

trine, evidence obtained by state officers, in a search by them which would have been unconstitutional if made by federal enforcement agents, could be turned over to federal agents for use in a federal court against a defendant on trial for a federal crime. *Elkins* rejected the doctrine as constitutionally invalid.

■ In view of the facts presented by this case, however, we need not now decide whether the *DeLeo* holding remains constitutionally viable. The fact that a search is made by persons not subject to the constitutional prohibition against unreasonable search and seizure does not free the Government from responsibility for its own participation in that search.[4] The principle is set out in the Manual for Courts-Martial as follows:[5]

> Evidence is inadmissible against the accused:
>
> > If it was obtained as a result of an unlawful search of the person or property of the accused conducted, instigated or participated in by an official or agent of the United States, or any State thereof . . . who was acting in a Governmental capacity.

■ In *Stonehill v. United States*, 405 F.2d 738, 743 (9th Cir. 1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969), the Court of Appeals determined that evidence obtained in searches by foreign enforcement agents in a foreign country was excludable from use in American courts only if American participation in those searches was so substantial "as to convert them into joint ventures between the United States and the foreign officials."[6]

We need not determine whether the *Stonehill* standard is correct or whether the Manual for Courts-Martial prescribes an independent rule of exclusion more stringent than that contemplated by the participation doctrine.[7] From any standpoint, we are convinced that American participation in the "total enterprise" of the search in this case was so extensive as to require exclusion of the evidence seized in the search.

In reaching our conclusion, we have disregarded entirely the accused's version of the search, which, had it been credited by the trial judge, would have demonstrated that Agent Miller of the CID detachment in Ansbach not only participated in the search, but was, as the accused contended, "in charge" of it. We have also passed over consideration of the correctness of a number of rulings by the trial judge, which prevented defense counsel from inquiring into the "totality" of what transpired.

Agent Miller testified that he had been with the CID in Germany since December 1970. In the early afternoon of November 27, 1972, he received information from a person who had worked with the CID office in Mannheim and, reputedly, had been "tested" by that office and found to be "very reliable." According to the informant, the accused occupied room 6 at Gasthaus Hauffreau, Nuernberger Strasse 7, Ansbach, Germany. On November 22, he had been in the room with the accused and saw a large quantity of prohibited substances, including marihuana; the accused told him he intended to sell these substances on payday, which was to be November 30.[8] Miller telephoned German Criminal Investigator Thomanek and asked him

---

**4.** *Lustig v. United States*, 338 U.S. 74, 78–79, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); *Gambino v. United States*, 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293 (1927).

**5.** Manual for Courts-Martial, United States, 1969 (Rev.), paragraph 152.

**6.** In his dissent in *Stonehill*, Circuit Judge Browning argued that the standard of joint participation represented "a misreading" by the majority of *Lustig v. United States, supra*, and *Byars v. United States*, 273 U.S. 28, 47

S.Ct. 248, 71 L.Ed. 520 (1927); it was his opinion that the degree of participation requiring exclusion of evidence was much less than that contemplated by the majority.

**7.** *Cf. United States v. Lincoln*, 17 U.S.C.M.A. 330, 38 C.M.R. 128 (1967).

**8.** The informant knew the accused only as "Jack." He identified him as the person he had seen and talked to from a photograph in a CID photo book.

to come to his office. When Thomanek arrived, Miller advised him of what he had learned from the informant. At Thomanek's request, he gave him a written statement on the matter. Thomanek testified that Miller "didn't say anything about the source" of his information in his oral statement; as noted earlier, Miller's written statement is silent as to the reliability of the informant.

Miller maintained that he had apprised the German police of the information as to the accused because "we had no jurisdiction over" the matter. He further indicated he did not consider informing any American authority of the matter as the German government had "primary jurisdiction off-base." He attributed his presence at the search, which was conducted the next day, both to a request by the German police that he assist them and to his desire to "observe" what transpired to protect "American military interests." Among the interests he deemed potentially in need of protection was that the German police did not "take a poor American citizen and mistreat him."

■ As a result of the Status of Forces Agreement between the United States and the Federal Republic of Germany in supplementation of the North Atlantic Treaty, since 1963 the "jurisdictional arrangements . . . provide for advance waiver to the United States of all concurrent jurisdiction offenses over which Germany has the primary right to exercise jurisdiction." [9] The agreement is not mentioned in the record of trial, but we are bound to take judicial notice of it as material to the appeal.[10] As Agent Miller had been operating in Germany for 2 years and conceded that he had "worked quite a few cases with the Germans *jointly*" (emphasis added), we would suppose that he knew of the German waiver of jurisdiction in cases of concurrent jurisdiction. For the same reasons, we would further suppose that Miller knew that of the thousands of cases involving American servicemen which were subject to the waiver, the German authorities did not exercise their right to revoke their waiver in 99 percent of the cases.[11]

Finally, we would suppose that on the basis of his experience, Agent Miller knew that possession of prohibited substances of the kind in issue was an offense under the Uniform Code of Military Justice, whether the possession was within or outside the boundaries of a military installation.[12] The inescapable inference from the circumstances is that Miller's stated reason for turning over to the German police the information he had about a possible drug offense by the accused was either the result of ignorance on his part or a deliberate purpose to deceive.[13] As Miller's testimony was accepted

**9.** Hearings Before a Subcomm. of the Senate Armed Services Comm. to Review the Operation of Article VII of the North Atlantic Treaty, Dec. 1, 1969, to Nov. 30, 1970, 92 Cong., 2d Sess., at 7 (1972). The waiver is subject to recall but only if recall is exercised "within three weeks *after notification* of an offense falling within the waiver" on a determination that exercise of German jurisdiction is "imperative." *Id.* (emphasis added). *See* Collective Defense Treaties, Committee Print, Committee on Foreign Affairs, House of Representatives, 91st Cong., 1st Sess., at 276–277, 330 (1969).

**10.** MCM, paragraph 147a. *See also* Feld, *What Is The Appellate Record? Appellate Inferences and Judicial Notice*, 22 JAG J 51 (1965).

**11.** *Hearings, supra* note 10, at 8. Dept. of Defense Statistics on the Exercise of Criminal Jurisdiction by Foreign Tribunals over United States Personnel (Dec. 1, 1971–Nov. 30, 1972), at 44.

**12.** *United States v. Keaton*, 19 U.S.C.M.A. 64, 41 C.M.R. 64 (1969); *United States v. Beeker*, 18 U.S.C.M.A. 563, 40 C.M.R. 275 (1969).

**13.** We recognize, of course, that even though the advance waiver of jurisdiction by the German government made it virtually certain that the American military would be responsible for any official investigative action on the informant's report, it would still be necessary for American officials to obtain German assistance for a search of premises in the civilian community. The justification for such a search, however, would have to meet American standards. *United States v. Carter*, 16 U.S.C.M.A. 277, 36 C.M.R. 433 (1966). USAREUR Suppl. 1 to AR 190–22, para. 2–1e (Dec. 16, 1971), which applies to American forces in Germany, and provides that a request to search privately rented premises in the civilian community "will not be made unless probable cause exists."

by the trial judge, we are not at liberty to choose between these alternatives. *United States v. Alaniz*, 9 U.S.C.M.A. 533, 26 C.M.R. 313 (1958). We turn, therefore, to the nature of the assistance he provided to the German police, as it appears from his own testimony and that of the German police.

On November 27, German police officer Thomanek presented Miller's statement of the information he had received from the informant to a German judge and obtained a warrant which authorized a search of both room 6 at Gasthaus Hauffraeu and the accused under section 102 of the German Code of Criminal Procedure.[14] The next day, he, Officer Bauer, and Officer Plankl, who was the "head" of the search team, "possibl[y] went to Miller's house" to ask him to attend the search.[15] Testifying through an interpreter, Plankl stated that he wanted Miller to be present at the search because whenever an American soldier was involved, "we have to have a person present from the CID or MP," and, also, as he spoke no English and the accused did not understand German, he wanted Miller as an interpreter.[16] The German police, Agent Miller, and an American MP went to the Gasthaus Hauffraeu. They found room 6 locked, and the accused absent. Miller then went to Katterbach, where the accused was on duty with his unit.

According to Plankl, Miller went to Katterbach to get the accused because the accused was "supposed to be present during the search." Plankl did not specifically say that he informed Miller of this requirement. Nevertheless, the trial judge found that Miller's only involvement in the search was

his "compliance with the request of the German police to bring . . . [the accused] to the scene . . . [of the search] because his presence was required under German Criminal Law Procedures." Miller's testimony does not support that finding. He stated that when he picked up the accused at his unit, he told him that he was "wanted for *questioning* by the German police," and that was "all . . . [he] told him." (Emphasis added.) He said nothing about the impending search of the accused's room. In fact, under German law, a person affected by a search of his premises need not be present at the time of the search. Thus, section 106 of the German Code of Criminal Procedure provides, in pertinent part: [17]

> (1) The owner (Inhaber) of the rooms or objects may be present at the search. In the event he is absent, his representative or a grown-up relative, fellow-lodger or neighbor shall, if possible, be called in to assist.

In his own testimony, Agent Miller did not claim that Officer Plankl asked him to bring the accused to the scene of the search because the accused had to be present; nor did he claim that he believed such presence was required by German law. Why then did he tell the accused he was wanted for questioning by the German police? The discrepancy can perhaps be reconciled on the basis that Plankl did not tell Miller why the accused should be brought to the gasthaus but merely asked him to bring the accused there, and when Miller undertook to comply with the request, he merely assumed the accused was to be questioned. If this were the whole of the matter, Miller's mistaken assumption might not have al-

---

**14.** The section has been translated as follows:

A search of the lodgings and other rooms of a person who is suspected as perpetrator of, or participant in, a punishable act, or as promoter or receiver, as well as of his body and of the property belonging to him, may be made for the purpose of his apprehension, as well as in the cases where it may be presumed that the search will lead to the discovery of evidence.

USAREUR Man. 550–155, at 29 (Sept. 27, 1955).

**15.** Miller testified that the German police came to the CID office to request that he bring the accused to Gasthaus Hauffraeu.

**16.** Miller professed to speak only a "little bit of German," but he apparently conversed freely and fully with the German police officials.

**17.** USAREUR Man. 550–155, at 30 (Sept. 27, 1955).

tered his role as messenger-escort. But there is much more.

■ Miller testified that after he informed the accused that the German police wanted him, the accused became "very, very belligerent," and he placed him "under apprehension" and put him in "hand irons." He then took him from his unit, without telling anyone in authority because he considered that "it was none of their business." Miller did not describe the nature of the accused's belligerency, but if we accept his testimony, as the trial judge did, the fair inference is that the accused protested the existence of any right on the part of the German police to subject him to interrogation. German law authorizes the arrest of an individual, but there was no outstanding warrant for the accused's arrest which Agent Miller was asked to effectuate; and, as already noted, German law does not mandate the presence at a search of particular premises of the reputed occupant of those premises, so there was no justification for the accused's arrest for that purpose. Still, the trial judge regarded Miller's forcible removal of the accused from his unit to the gasthaus as the kind of assistance authorized by Article VII, section 6(a) of the NATO Status of Forces Agreement. In our opinion, the judge misconceived and misapplied the agreement.

Section 6(a) of Article VII of the agreement relates only to assistance in the collection of evidence "including the seizure and, in proper cases, the handing over of objects connected with an offence."[18] The section does not deal with the seizure or apprehension of a person. That subject is covered in section 5(c) of Article VII, which provides as follows:[19]

The custody of an accused member of a force . . . over whom the receiving State is to exercise jurisdiction shall, if he is in the hands of the sending State, remain with that State until he is charged by the receiving State.

At the time Miller apprehended the accused, there was, in fact, no charge by the German Republic against the accused. Moreover, there could be none until the German officials recalled their advance waiver of jurisdiction.

When the accused was brought by Miller to Gasthaus Hauffraeu, he was asked if he had a key to the room. He replied in the negative and indicated that he "wasn't living there." As a result, the landlady of the premises was brought to the scene. She represented that the accused had rented room 6 and had been given two keys, one to the main entrance door and the other to the door of the room. The door to the room also had a safety lock. As this lock could not be opened, the door was forced. We skip over the details of the search of the room, in regard to which Miller testified he was "just . . . an observer," and turn to what next transpired. Defense counsel contended that these events were part of the "totality of the operation," and they indicated "continued and increased American involvement." However, the trial judge ruled that the events were "after the fact," and, therefore, had "nothing to do" with the American participation in the search of room 6. The record, however, demonstrates that Plankl regarded the later events as part of the search.

Plankl testified that he asked Miller to go to the accused's unit to search the accused's room for the keys. He stated he made the request because "we were afraid that the key might be taken away."[20] The entire

**18.** Agreement between the Parties to the North Atlantic Treaty regarding the Status of their Forces, June 19, 1951, [1953] 2 UST 1792, TIAS No. 2846. *See United States v. DeLeo, supra* at 156 n. 2, 17 C.M.R. at 156.

**19.** Article VII, section 5(c), NATO SOFA, *supra* note 9.

**20.** The interest in the keys could have been generated by the realization that if the keys

could be found in the accused's possession his disclaimer of occupancy of the room would be discredited and the representation of the landlady would be strengthened. When trial counsel indicated after examining Plankl only as to the search of room 6, that he was through with his inquiry, Plankl interjected: "But this wasn't all there. We still went into the Kaserne."

group, including the accused, went to the accused's unit. Miller talked privately to a person Plankl believed was the unit commander. Thereafter, the accused's quarters were searched. Plankl found three keys in a drawer. He took all of them. Accompanied by Officer Bauer, he returned to the gasthaus and determined that one key fit the door to the main entrance, a second fit the regular lock of the door to room 6, and the third was the "key to the safety lock." Plankl admitted that the German warrant did not authorize a search of the accused's room at his unit. Nor can the search be justified by American standards. Apart from the fact that no evidence of proper authorization by a competent official was presented, nothing found or learned in the search of room 6 provided probable cause to believe that the keys would be found in the accused's quarters at his unit. *United States v. Gibbins*, 21 U.S.C.M.A. 556, 45 C.M.R. 330 (1972).

Finally, after the search of the accused's military quarters, he was taken by Agent Miller to the CID office. Police Officer Thomanek accompanied them. Defense counsel's attempt to inquire into what transpired at the office was disallowed by the trial judge, but Miller admitted that after the search he opened a CID file on the accused, and Plankl testified that he reported to Miller for "the purpose of his investigation" that the keys fit the lock at the gasthaus.

The evidence compels a conclusion that Agent Miller was not a bystander or observer, intent only on seeing the accused's rights were not violated, or that he was

merely a convenient interpreter for the German police. At least two of his actions enabled the search to move in directions that the German police could not themselves go. First, without command of German law and contrary to the waiver of German primary jurisdiction, Miller brought the accused to the gasthaus so he could be searched. Secondly, Miller arranged for the search of the accused's room at his military unit. This search was not sanctioned by the German warrant and was in violation of American law; it produced evidence that confirmed the accused's connection with the room in which other incriminating evidence was discovered. Manifestly, the total enterprise was not an exclusive German effort, but the joint accomplishment of Agent Miller and the German police. As it was effected by means that violated American law, the evidence obtained in the search was inadmissible against the accused.

The decision of the Court of Military Review is reversed and the findings of guilty and the sentence are set aside. A rehearing may be ordered.

Senior Judge FERGUSON concurs.

Chief Judge FLETCHER did not participate in the decision of this case.

---

Trial counsel continued to treat the search of room 6 as wholly unrelated to, and separate from the search of accused's quarters at his organization.