UNITED STATES, Appellee,

v.

Glenn E. JORDAN, Airman, U.S. Air Force, Appellant.

No. 29,592.

U. S. Court of Military Appeals.

March 12, 1976.

*Major Bruce R. Houston* argued the cause for Appellant, Accused.

*Captain Alvin E. Schlechter* argued the cause for Appellee, United States. With him on the brief were *Colonel C. F. Bennett* and *Colonel Julius C. Ullerich, Jr.*

*Lieutenant Colonel Donald W. Hansen, Major John T. Sherwood, Jr.,* and *Captain Richard A. Kirby,* filed a brief amicus curiae on behalf of the Department of the Army.

## OPINION OF THE COURT

FLETCHER, Chief Judge:

Following the release of our initial opinion in this case, the Government filed a timely petition for reconsideration [1] urging that we reexamine the exclusionary rule promulgated by the majority "that evidence obtained by search and seizure in a foreign country must meet Fourth Amendment standards in order to be admitted in evidence in a trial by court-martial, regardless of whether it . . . [was] obtained by foreign police acting on their own or in

---

1. Rule 50, Rules of Practice and Procedure, United States Court of Military Appeals.

conjunction with American authorities." *United States v. Jordan*, 23 U.S.C.M.A. 525, 527, 50 C.M.R. 664, 666, 1 M.J. 145, 149 (1975). We subsequently granted the Government's motion and, in addition, offered the other services an opportunity to file amicus curiae briefs. The question then was redocketed for oral argument which was heard on November 17, 1975.

The Government contends that the practical effect of our initial decision, although couched in terms of the admissibility of evidence, is to thwart the congressional policy of maximizing American criminal jurisdiction over our service-members who commit offenses while stationed in a foreign country.[2] Stated differently, the admissibility standard announced would lead to trial in foreign courts of a substantial number of criminal offenses committed by servicemen overseas.[3] The Government views such a result as neither constitutionally required nor judicially warranted.

### I

■ We turn first to the constitutional question whether compliance with the Fourth Amendment by foreign authorities conducting a search in their own country is a prerequisite for use of the seized evidence in a trial by court-martial. Re-examination of the underlying purpose of the exclusionary rule convinces us that extension of the concept to encompass searches conducted solely by foreign officials is not constitutionally mandated. Mr. Justice Clark, writing for a majority of the Supreme Court in

*Linkletter v. Walker*, 381 U.S. 618, 636–37, 85 S.Ct. 1731, 1741, 14 L.Ed.2d 601 (1965), observed that "all of the cases since *Wolf*[4] requiring the exclusion of illegal evidence have been based on the necessity for an effective deterrent to illegal police action." More recently, in *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974), the Supreme Court reiterated that "[t]he purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim . . . . In-stead, the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment." *Accord, United States v. Peltier*, 422 U.S. 531, 538–39, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975); *Coolidge v. New Hampshire*, 403 U.S. 443, 488, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

■ We agree with Government counsel that application of the exclusionary rule to all actions of the foreign police would have minimal deterrent effect and perhaps for legitimate reason since foreign police action, even though violative of our Constitution, may be perfectly acceptable conduct under the law of their sovereign. This being the case, it is only logical that most foreign police officials would elect to comply with their own legal scheme rather than with ours. Thus, extension of the exclusionary rule to encompass all foreign searches would not serve the principal purpose for the rule's existence, the deterrence

---

2. *See Hearings on the Status of the North Atlantic Treaty Organization, Armed Forces, and Military Headquarters, Before the Senate Comm on Foreign Relations*, 83d Cong, 1st Sess (1953); *Hearings on H. R. Res. 309 and Similar Measures Before the House Comm on Foreign Affairs*, 84th Cong, 1st Sess, pts 1 and 2 (1955–56). *See also* S. Res., Ratification with Reservations, North Atlantic Treaty, Status of Forces Agreement, July 15, 1953, [1953] 2 UST 1828, TIAS 2846, also appearing in Moyer, Justice and the Military § 1–624 (1972).

3. The Federal courts have expressed a preference for trial by court-martial as opposed to trial in foreign courts. Writing for the Court of Claims in *Gallagher v. United States*, 423 F.2d 1371, 1374, 191 Ct.Cl. 546 (1970), *cert. denied,*

400 U.S. 849, 91 S.Ct. 58, 27 L.Ed.2d 86 (1970), Judge Nichols took judicial notice that many servicemen are stationed in overseas areas, "some of which have a reputation for harsh laws and savagely operated penal institutions." And, in *Williams v. Froehlke*, 490 F.2d 998, 1004 (2d Cir. 1974), the Second Circuit observed that "[i]t was undoubtedly thought [by Congress] a boon to the accused to permit his trial in a court-martial rather than in a foreign court where a soldier might be subject to varying degrees of xenophobia."

4. *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949).

of future *unlawful* police conduct.[5] In addition, as the Government has suggested, the practical effect of our prior ruling was to hinder rather than to protect servicemen's constitutional rights by encouraging trial in foreign courts with no American constitutional safeguards. While virtually no one relishes a criminal trial in which he or she must appear as the defendant, most would agree that if given the Hobson's choice of appearing at trial with some constitutional safeguards as opposed to none, the question becomes, at best, rhetorical.

## II

Of equal importance is whether the *DeLeo*[6] standard for American police participation in foreign searches remains the appropriate formula for determining when the Fourth Amendment and the exclusionary rule safeguard should be activated. In *DeLeo*, this Court modified for foreign searches what was then known in federal practice as the "silver platter doctrine" which mandated Fourth Amendment compliance in Federal prosecutions where agents of the United States participated "to some recognizable extent" in a search conducted by state officials. *See Lustig v. United States*, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 819 (1949); *Byars v. United States*, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927). Assuming a protective posture, the Court concluded that the "mere presence" of American officials at the scene of a foreign search was desirable "for the purpose of assuring that the legitimate interests of the [American] suspect are protected in the conduct of the foreign investigation," and such presence was deemed insufficient to trigger the Fourth Amendment. *United States v. DeLeo*, 5 U.S.C.M.A. 148, 156, 17 C.M.R. 148, 156 (1954).

While we still believe that American scrutiny of foreign searches is desirable where American servicemen are involved, no longer are we willing to exact Fourth Amendment protections as the price for such presence. Military as well as federal practice has evidenced continuing difficulty in drawing the line between "mere presence" and participation.[7] Such ambivalence on the part of the courts inevitably leads enforcement authorities to test the limits of the doctrine. Yet such stress defeats the very reason for the exclusionary rule, to deter violations of the Fourth Amendment by removing the incentive to disregard it. *See Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), *citing Eleuteri v. Richman*, 26 N.J. 506, 513, 141 A.2d 46, 50 (1958). *See also People v. Kelley*, 66 Cal.2d 232, 57 Cal.Rptr. 363, 424 P.2d 947, 961 (1967).

The temptation confronting American officials to avoid the Fourth Amendment by merely delegating primary search authority to those not subject to our Constitution coupled with the unending judicial dilemma of resolving what is and is not sufficient participation to trigger the constitutional guaranty leads us to conclude that the *DeLeo* standard no longer is satisfactory to

---

5. Federal and State courts which have considered the question have reached a similar conclusion. *See United States v. Callaway*, 446 F.2d 753 (3d Cir. 1971), *cert. denied*, 404 U.S. 1021, 92 S.Ct. 694, 30 L.Ed.2d 670 (1972); *United States v. Shea*, 436 F.2d 740 (9th Cir. 1970); *United States v. Nagelberg*, 434 F.2d 585 (2d Cir. 1970), *cert. denied*, 401 U.S. 939, 91 S.Ct. 935, 28 L.Ed.2d 219 (1971); *Stonehill v. United States*, 405 F.2d 738 (9th Cir. 1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969); *Brulay v. United States*, 383 F.2d 345 (9th Cir. 1967), *cert. denied*, 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967); *Birdsell v. United States*, 346 F.2d 775 (5th Cir. 1965), *cert. denied*, 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965); *Commonwealth v. Wallace*, 356 Mass. 92, 248 N.E.2d 246 (1969).

6. *United States v. DeLeo*, 5 U.S.C.M.A. 148, 17 C.M.R. 148 (1954).

7. *See, e. g., Stonehill v. United States, supra; Brulay v. United States, supra; Birdsell v. United States, supra; United States v. Schnell*, 23 U.S.C.M.A. 464, 50 C.M.R. 483, 1 M.J. 94 (1975); *United States v. Price*, 17 U.S.C.M.A. 566, 38 C.M.R. 364 (1968); *United States v. DeLeo, supra; United States v. Atkins*, 41 C.M.R. 1007 (A.F.C.M.R. 1970), *petition denied*, 41 C.M.R. 402 (U.S.C.M.A. 1970); *United States v. Rogers*, 32 C.M.R. 623 (ABR 1962); *United States v. Whitler*, 5 C.M.R. 458 (AFBR 1952), *petition denied*, 5 C.M.R. 131 (U.S.C.M.A. 1952).

safeguard the constitutional rights of servicemen stationed in a foreign country. Much the same rationale led the Supreme Court to invalidate the "silver platter doctrine" as it had been applied to state-secured evidence used in Federal prosecutions. *Elkins v. United States, supra,* 364 U.S. at 212–24, 80 S.Ct. 1437. Even though satisfied that, in the foreign search context, the *Elkins* remedy would serve neither the national interest nor the underlying purpose of the exclusionary rule, we remain unpersuaded that the *DeLeo* approach, even as modified by paragraph 152, Manual for Courts-Martial, United States, 1969 (Rev), satisfactorily achieves these objectives.[8]

■ We therefore hold that, for trials by court-martial commencing after the date of this opinion, whenever American officials are present at the scene of a foreign search or, even though not present, provide any information or assistance, directive or request, which sets in motion, aids, or otherwise furthers the objectives of a foreign search, the search must satisfy the Fourth Amendment as applied in the military community before fruits of the search may be admitted into evidence in a trial by court-martial. If the Government seeks to use evidence obtained either directly or indirectly from a search conducted solely by foreign authorities, a showing by the prosecution that the search by foreign officials was lawful, applying the law of their sovereign, shall be a prerequisite for its admission in evidence upon motion of the defense. *Compare United States v. Price,* 17 U.S.C.M.A. 566, 570, 38 C.M.R. 364, 368 (1968), *with United States v. Atkins,* 41 C.M.R. 1007, 1010 n. 1 (A.F.C.M.R. 1970), *petition denied* 41 C.M.R. 402 (U.S.C.M.A. 1970). In addition, prior to admitting the evidence, the trial judge shall satisfy himself that the foreign search does not shock the conscience of the court. *Cf. United States v. Hebert,*

23 U.S.C.M.A. 499, 500, 50 C.M.R. 579, 580, 1 M.J. 84 (1975); *United States v. Callaway,* 446 F.2d 753, 755 (3d Cir. 1971); *United States v. Nagelberg,* 434 F.2d 585, 587 n. 1 (2d Cir. 1970); *Stonehill v. United States,* 405 F.2d 738, 745 (9th Cir. 1968); *Birdsell v. United States,* 346 F.2d 775, 782 n. 10 (5th Cir. 1965).

### III

■ In order to resolve whether the Fourth Amendment should have been applied in determining the admissibility of the evidence seized during the search by foreign officials in this case as well as the admissibility of the accused's subsequent statements which were fruits thereof, we quote briefly from the factual analysis in our prior decision.[9]

Several burglaries had occurred in off-base, British-owned housing occupied by American service personnel in Bicester, England. Detective Sergeant Anthony Miller of the local police was in charge of the investigation. He received information which led him to believe that a black and white automobile with a noisy exhaust was involved. On April 18, 1974, he observed such a vehicle driving in the housing area in which the burglaries occurred. It was operated by the accused. Sergeant Miller stopped the vehicle and questioned the accused. He then looked into the vehicle and observed a rock and a black glove. Miller cautioned the accused and took him into custody.

Miller interrogated the accused at the Bicester police station and determined that he lived at the hospital on the air base. He told the accused that he intended to search his room and asked if he had any objection. The accused replied that there was nothing there, and Miller "asked him if he minded if I went and

8. The *DeLeo* rule was partially modified by the President in promulgating paragraph 152, Manual for Courts-Martial, United States, 1969 (Rev), in accordance with his statutory authority to prescribe rules of procedure in cases before courts-martial. Article 36, Uniform Code of Military Justice, 10 U.S.C. § 836. Under paragraph 152, the exclusionary rule is triggered whenever an unlawful search is "conducted, instigated, or participated in by an official or agent of the United States or any State thereof . . . ."

9. 23 U.S.C.M.A. at 525–26, 50 C.M.R. at 664–65, 1 M.J. at 145, 146.

had a look." Accused requested permission to make a telephone call. As accused would not state to whom the call would be made, Miller refused to permit him to do so. Miller again asked accused "if I could look in his room and he replied, 'Yes, I can't. really stop you.'"

Detective Sergeant Miller secured the accused's keys and, accompanied by Constable Leadbetter, proceeded to the air base. There, he went to the air police office "out of courtesy, to let them know that I was conducting an inquiry; that I wished to search a particular room." Sergeant Hanson and Sergeant Hoard of the air police accompanied the British officers to the accused's room.

There, the accused's belongings were searched. According to Miller, the air police took no part in the search other than to unlock a padlock on the accused's locker and to look around the room.

According to the accused, Miller stated it was his intention to search his room and "asked my permission." Miller refused to allow the accused to make a telephone call and told the accused "it would be easier if I went ahead and gave my consent; if not, he could get a warrant." Accused replied that "there was nothing I could do." At no time did he convey the impression that he agreed to the search.

The search disclosed the presence of property stolen from the burglarized premises. It was photographed by an Air Force photographer summoned at Miller's request and turned over to the British officers. Miller returned to the local police station and, confronting the accused with the seized items, obtained a statement from him.

The actions of the American officials in unlocking the accused's locker as well as photographing the stolen property demonstrate participation, even under *DeLeo* and the Manual, sufficient to require Fourth Amendment compliance. Viewed most favorably to the Government, the facts simply do not establish that, during the search, Air Force officials were merely bystanders or observers, "intent only on seeing the accused's rights were not violated." *United States v. Schnell*, 23 U.S.C.M.A. 464, 470, 50 C.M.R. 483, 489, 1 M.J. 94, 100 (1975).

No challenge has been lodged to our resolution of the consent question in the initial opinion, and we adhere to it. As the evidence was seized in this case without the accused's freely given consent and as his statements were fruits of that illegal search, reversal must necessarily follow.

The decision of the United States Air Force Court of Military Review is reversed. Because the record reveals no admissible substitute for the excluded evidence, the charges are ordered dismissed.

Senior Judge FERGUSON concurs.

COOK, Judge (dissenting):

In my dissent to the original opinion, I pointed out that a "foreign government, like a private person, is just not subject" to the prohibitions of the United States Constitution. 23 U.S.C.M.A. 525, 529, 50 C.M.R. 664, 668, 1 M.J. 145, 150 (1975). As the exclusionary rule applies only to those prohibitions, and they govern only Federal and State authorities, I perceive no justification to inquire into whether the search by a person not subject to the constitutional prohibitions comports with local law. Consequently, I disagree with the new pronouncement by the majority that the Government must first demonstrate that a search by foreign police "was lawful, applying the law of their sovereign," before evidence obtained in the search can be admitted at a court-martial, notwithstanding there was no American involvement whatever.

I further disagree with the majority's pronouncement that the mere presence of "American officials . . . at the scene of a foreign search" conducted by a foreign police brings the search within the ambit of the constitutional prohibition against unreasonable search and seizure. Mere presence is not participation. Our cases and the federal civilian cases emphasize that for the constitutional exclusionary rule to be operative there must be some significant connection between the American authorities and

the foreign police so that it can reasonably be concluded that the search was a common or joint endeavor. *United States v. Schnell*, 23 U.S.C.M.A. 464, 50 C.M.R. 483, 1 M.J. 94 (1975), and cases cited therein. In my earlier dissent, I considered it unnecessary to determine whether the Manual for Courts-Martial, United States, 1969 (Rev), prescribed an evidentiary rule more restrictive than the constitutional exclusionary rule. The majority now conclude that it does. Even that rule, however, does not attach an American connection to a foreign police search on the basis of mere presence. Unless contrary to the Constitution or the Uniform Code, rules of evidence prescribed in the Manual have the force of law and are binding upon this Court. *United States v. Smith*, 13 U.S.C.M.A. 105, 32 C.M.R. 105 (1962). By its terms, the Manual requires more than presence at the scene.[1] Moreover, the draftsmen of the Manual refer expressly to *United States v. DeLeo*, 5 U.S. C.M.A. 148, 17 C.M.R. 148 (1954), as authority for their statement that "the rule would seem to have no application to searches conducted by foreign authorities." Department of the Army Pamphlet No. 27–2, Analysis of Contents, Manual for Courts-Martial, United States, 1969 (Rev), at 27–39. In *DeLeo*, the Court upheld the admission of evidence obtained by foreign police in a search conducted by them but which was attended by American agents who did not participate.[2]

Considering the evidence in this case of the conduct of the American agents at the scene of the search, I remain convinced that they did not participate in any way as to constitute the search a common or joint venture. I would, therefore, affirm the decision of the United States Air Force Court of Military Review.

---

1. Paragraph 152, MCM, reads as follows:
   152. CERTAIN ILLEGALLY OBTAINED EVIDENCE. Evidence is inadmissible against the accused:

   .     .     .     .     .

   If it was obtained without the freely given consent of the accused as a result of an *unlawful search* of another's premises on which the accused was legitimately present, and the search in question was conducted, instigated, or participated in by an official or agent of the United States, or any State thereof or political subdivision of either, who was acting in a Governmental capacity. [Emphasis in text.]

2. It is worth noting that the claim of the accused in *United States v. DeLeo*, 5 U.S.C.M.A. 148, 17 C.M.R. 148 (1954), that mere presence at the scene is sufficient to involve an Ameri-

can agent in a foreign search was not supported by the cited case, *Byars v. United States*, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520 (1927). In *Byars*, the federal agent admitted that he entered the private premises of the accused only on the authority of a state warrant which was later determined to be insufficient to satisfy the constitutional provision, and that he " 'searched' " one of the rooms and " 'took possession' " of the evidence that he found. On the facts, the Supreme Court concluded that the Federal agent "was not invited to join the state squad as a private person might have been, but was asked to participate *and did participate* as a federal enforcement officer." *Id.* at 31–32, 47 S.Ct. at 249 (emphasis added).