UNITED STATES, Appellee,

v.

**Sergeant Tyrone R. PORTER, 364–58–4346, United States Army, Appellant.**

**ACMR 9100379.**

U.S. Army Court of Military Review.

29 Jan. 1993.

For Appellant: Captain Michael Huber, JAGC (argued); Major Robin L. Hall, JAGC, Captain Alan M. Boyd, JAGC, Captain Mark L. Toole, JAGC (on brief).

For Appellee: Captain Jane F. Polcen, JAGC (argued); Colonel Dayton M. Cramer, JAGC, Lieutenant Colonel Joseph A. Russelburg, JAGC, Major Joseph C. Swetnam, JAGC, Major Timothy W. Lucas, JAGC (on brief).

Before CREAN, WERNER, and GONZALES, Appellate Military Judges.

## OPINION OF THE COURT

GONZALES, Judge:

Contrary to his pleas, the appellant was found guilty on 27 February 1991, by a military judge sitting as a general court-martial, of involuntary manslaughter in violation of Article 119, Uniform Code of Military Justice, 10 U.S.C. § 919 (1982) [hereinafter UCMJ]. The convening authority approved the adjudged sentence of a bad-conduct discharge, confinement for eighteen months, forfeiture of all pay and allowances, and reduction to Private E1.

On appeal, the appellant asserts two assignment of errors: (1) the military judge erred in denying the defense's motion to exclude from evidence the results of a blood alcohol test (BAT) that was obtained in violation of Military Rule of Evidence 311,[1] and (2) the government failed to bring the appellant to trial within the time limits

---

1. Manual for Courts-Martial, United States, 1984, Military Rule of Evidence 311(c) [herein- after Mil.R.Evid. 311(c)].

imposed by R.C.M. 707.[2] We agree with only the first assertion, but affirm the findings and the sentence.

The appellant was operating his 1987 Nissan along Central Espana Avenue, a four-lane street in a residential section of Panama City, Panama, at approximately 2230 hours on 2 February 1990. His vehicle struck a 20–year–old Panamanian national who was attempting to cross Central Espana to catch a bus. The victim died almost immediately from his injuries. After hitting the pedestrian, the appellant's vehicle sped a short distance along Central Espana, veered onto the sidewalk, and came to rest at a 45–degree angle against an electrical/telephone pole.

The location of this tragedy brought the incident within the primary jurisdiction of the Republic of Panama. When Panamanian police officer Virillo Salazar arrived at the scene, he found the appellant in his vehicle. Officer Salazar was unable to get the appellant to respond to his questions, which were all asked in Spanish.

At approximately 0019 hours on 3 February 1990, Specialist (SPC) Tucker, a military policeman from Fort Clayton, arrived at the scene. He found the appellant in Officer Salazar's police vehicle. He repeatedly asked the appellant if he was hurt or needed help, but the appellant never answered. The appellant appeared to be groggy and sleepy with his head leaning against the vehicle's door window. The strong odor of alcohol covered the appellant's breath.

Specialist Tucker made observations of the scene and secured the appellant's personal effects, to include his checkbook, from his vehicle. In doing so, he eventually recognized the appellant by name as a witness in a previous, unrelated case and recalled that he was assigned to the Medical Company at Gorgas Army Hospital.

Officer Salazar decided to transport the appellant to Santo Tomas Hospital for a BAT to include in his report. He asked SPC Tucker to follow them in his military police van. When they arrived at the Panamanian hospital, both Officer Salazar and SPC Tucker had to substantially assist the appellant as they entered the hospital. The appellant was still not providing coherent responses to SPC Tucker's questions.

Medical personnel at the hospital informed Officer Salazar that it would be at least two hours before a BAT could be administered, if at all that night, on the appellant. Officer Salazar then asked SPC Tucker if a BAT could be performed at Gorgas Army Hospital. Specialist Tucker responded that they should take the appellant to Gorgas and see what could be done there. Specialist Tucker placed the appellant in his van and Officer Salazar followed them in his vehicle.

When they arrived at Gorgas, at approximately 0100 hours, SPC Tucker again assisted the appellant into the hospital. The appellant's balance and coordination had improved slightly. The odor of alcohol on the appellant's breath, however, remained very strong. Once inside the hospital, Nurse O'Brien informed them that Officer Salazar could not request a BAT because Gorgas was a U.S. Government installation. The BAT could be performed only if SPC Tucker completed the required form.[3] Specialist Tucker was willing to do so. The form was actually completed by Nurse O'Brien and SPC Tucker signed it. The time noted on the form was 0110 hours. Specialist Tucker then escorted the appellant to the emergency room where he assisted Nurse O'Brien in administering the BAT by placing the seal on the blood tube.

Specialist Tucker indicated that he never attempted to call the appellant's commander for authorization before signing the required form because the case was being investigated by, and the appellant was in the custody of, Officer Salazar. Specialist Tucker did not view himself as being in charge of the investigation; his role was to assist Officer Salazar in performing his duties.

---

2. Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 707 [hereinafter R.C.M.].

3. DD Form 1323, "Toxicological Examination—Request and Report."

Officer Salazar did not want to relinquish custody of the appellant until he received the results of the BAT and questioned the appellant. However, at approximately 0230 hours, Officer Salazar released the appellant to SPC Tucker on the condition that he could return to question the appellant at a later time when he was sober. Specialist Tucker took the appellant to the MP station at Fort Clayton where he was placed in the detention cell (D–cell) until his sobriety improved.

The appellant's blood sample was tested at Gorgas Army Hospital. It indicated a blood alcohol content of .26 percent.

### I.

The appellant now contends that SPC Tucker's participation in the BAT process was a search that required either a search warrant or authorization or the existence of exigent circumstances. Since no search warrant or authorization was obtained and the appellant believes that exigent circumstances did not exist, he argues that the BAT was an unlawful search and seizure. Therefore, he contends the military judge should not have admitted the BAT results into evidence.

The government argues, as the military judge determined in his essential findings of fact, that SPC Tucker did not conduct or participate in what, in essence, was a foreign search and, therefore, a search warrant or authorization from a competent military authority was not required. In the alternative, the government argues that if SPC Tucker's actions constituted "participation" in the foreign search or that he actually conducted the search, then exigent circumstances, in lieu of a search warrant or authorization, justified the taking of the blood sample and provides the basis for this Court to consider the test result as admissible evidence.

We begin our analysis with whether administering the BAT at Gorgas Army Hospital was a foreign or a U.S. search. The pertinent Military Rule of Evidence that applies to the search and seizure in this case is 311(c), which provides:

*Nature of search or seizure.* A search or seizure is "unlawful" if it was conducted, instigated, or participated in by:

(1) *Military personnel.* Military personnel or their agents and was in violation of the Constitution of the United States as applied to members of the armed forces, an Act of Congress applicable to trials by court-martial that requires exclusion of evidence obtained in violation thereof, or Mil.R.Evid. 312–317;

. . . .

A search or seizure is not "participated in" merely because a person is present at a search or seizure conducted in a foreign nation by officials of a foreign government or their agents, or because a person acted as an interpreter or took steps to mitigate damage to property or physical harm during the foreign search or seizure.

 In reviewing United States police action in assisting foreign police officials, we must closely analyze any cooperative activity to distinguish the actions of United States officials from those of foreign officials, and apply our norms and law to any and all United States action. *United States v. Coleman,* 25 M.J. 679, 686 (A.C.M.R.1987). The government's initial position that SPC Tucker did not conduct or participate in the BAT process would be more plausible if the BAT had been administered at Santo Tomas Hospital where SPC Tucker would have been no more than a bystander. However, the BAT was performed at Gorgas Army Hospital where SPC Tucker took on a role that was beyond the bounds of being a bystander.

Specialist Tucker's actions were very similar to those taken by Air Force police personnel in *United States v. Jordan,* 1 M.J. 334 (C.M.A.1976), where the court determined the military policemen's involvement constituted participation in a foreign search.[4] In *Jordan,* a British police ser-

---

**4.** We recognize that *United States v. Morrison,* 12 M.J. 272 (C.M.A.1982), held that the rule of *Jordan*—which equates presence at a foreign search with participation in that search—should no longer be applied. However, we use *Jordan* in this case to initiate our review of SPC Tuck-

geant took Airman Jordan into custody after suspecting him of committing several burglaries in the community outside of the local air base. When the police sergeant learned that Jordan lived at the hospital on the air base, he obtained the key to his room from him. The police sergeant went to the air police office on the air base, where two air policemen were detailed to accompany the police sergeant to Jordan's room. There, they found a locker secured with a padlock. The air police assisted by unlocking the padlock for the police sergeant, who conducted the actual search of its contents. The search disclosed the presence of property stolen from the burglarized premises. The property was photographed by an Air Force photographer who was summoned to the room at the police sergeant's request.

The court concluded that the "actions of the American officials in unlocking the accused's padlock as well as photographing the stolen property demonstrated participation, even under ... the Manual, sufficient to require Fourth Amendment compliance. Viewed most favorably to the Government, the facts simply do not establish that, during the [foreign] search, Air Force officials were merely bystanders or observers, 'intent only on seeing the accused's rights were not violated.'" (citation omitted). *Jordan*, 1 M.J. at 339.[5]

Like the British police sergeant in *Jordan*, Officer Salazar had an American soldier in his custody and was accompanied by a military policeman during his investigation. The police sergeant encountered a dilemma when he was unable to enter Jordan's secured locker. Officer Salazar's dilemma was not being qualified to request a BAT at a military hospital. In both situations, involvement by military personnel was necessary before a search/BAT could be effected. Without the unlocking of the

padlock by the air police, the British police sergeant would not have been able to search Jordan's locker and have the incriminating evidence photographed by an Air Force photographer. Similarly, without SPC Tucker's request for the BAT, a blood sample would not have been drawn from the appellant that night and subsequently tested by hospital personnel.

The only difference between *Jordan* and the instant case, and it is a significant one, is that the actual search in this case was performed exclusively by United States military personnel rather than a foreign official. It is another persuasive reason to consider this a U.S. search and to require compliance with the Fourth Amendment. The evidence compels a conclusion that SPC Tucker was not merely a bystander, observer, or interpreter intent only on seeing the appellant's rights were not violated. His driving the appellant to Gorgas Army Hospital, requesting the BAT, signing the required form, and assisting the nurse to administer the BAT, enabled the search to occur and move in a direction that Officer Salazar could not have gone himself. *See United States v. Schnell*, 1 M.J. 94 (C.M.A. 1975). Accordingly, we find that SPC Tucker's involvement constituted "participation" which made the BAT process a U.S. search that required either a search warrant or authorization, or the existence of exigent circumstances to satisfy the Fourth Amendment.

No search warrant or authorization was obtained in this case. Accordingly, we turn to the matter of exigent circumstances in the context of extraction of bodily fluids. Military Rule of Evidence 312(d) provides:

*Extraction of body fluids.* Nonconsensual extraction of body fluids, including blood and urine, may be made from the body of an individual pursuant to a

---

er's actions on 3 February 1990 at Gorgas Army Hospital to determine if they were enough to constitute "participation" in a foreign search under Mil.R.Evid. 311(c).

**5.** The Manual provision referred to in *Jordan* was Manual for Courts-Martial, United States, 1969 (Rev. ed.), para. 152, whose wording is similar to today's Mil.R.Evid. 311(c):

Evidence is inadmissible against the accused: If it was obtained as a result of an unlawful search of the person or property of the accused conducted, instigated, or participated in by an official or agent of the United States, or any State thereof or political subdivision of either, who was acting in a Governmental capacity....

search warrant or a search authorization under Mil.R.Evid. 315. Nonconsensual extraction of body fluids may be made without such warrant or authorization, notwithstanding Mil.R.Evid. 315(g), only when there is clear indication that evidence of crime will be found and that there is reason to believe that the delay that would result if a warrant or authorization were sought could result in the destruction of the evidence. Involuntary extraction of body fluids under this rule must be done in a reasonable fashion by a person with appropriate medical qualifications.

Military Rules of Evidence 315(g)(1) and (2) provide:

*Exigencies.* A search warrant or search authorization is not required under this rule for a search based on probable cause when:

(1) *Insufficient time.* There is a reasonable belief that the delay necessary to obtain a search warrant or search authorization would result in the removal, destruction, or concealment of the property or evidence sought;

(2) *Lack of communications.* There is a reasonable military operational necessity that is reasonably believed to prohibit or prevent communication with a person empowered to grant a search warrant or authorization and there is a reasonable belief that the delay necessary to obtain a search warrant or search authorization would result in the removal, destruction, or concealment of the property or evidence sought. . . .

█ We find that probable cause existed to authorize the BAT. Specialist Tucker, however, testified that the reason he did not try to obtain authorization for the BAT was because he thought the Panamanians were in control of the case. There is no evidence that it was because time was of the essence and that SPC Tucker was concerned that the alcohol content in the appellant's blood stream would dissipate or that destruction of evidence was threatened. Further, SPC Tucker knew the appellant's name and that the appellant's unit of assignment was the Medical Company at Gor-

gas Army Hospital, the precise place where SPC Tucker was standing with the appellant and where the BAT was to be administered. There is no evidence that military operational necessity prohibited or prevented SPC Tucker from contacting the appellant's commander. Finally, SPC Tucker's request for the BAT was made within three hours of the accident. The time and effort that would have been necessary to contact the appellant's commander, under these circumstances, do not support a reasonable belief that the delay in obtaining the authorization would have resulted in the disappearance of the evidence. We, therefore, find that no exigent circumstances existed in this case.

We find that the administering of the BAT on the appellant was an unlawful search under Mil.R.Evid. 311(c), because it was performed in a United States Army medical facility by military personnel without a search warrant or authorization in violation of the Fourth Amendment. We further find that there was no evidence of exigencies under Mil.R.Evid. 312(d) and 315(g) to support a reasonable belief that the delay necessary to obtain a warrant or authorization would result in the removal or destruction of the evidence sought or that military operational necessity prevented communication with a person empowered to grant a search warrant or authorization. Therefore, we hold that the BAT results should not have been admitted into evidence by the military judge.

█ Although the results of the BAT should have been excluded from evidence, we, however, find that there was ample evidence of the appellant's intoxication at the time of the fatal accident to support the appellant's conviction. The appellant testified that he started consuming alcoholic beverages approximately five hours before the incident that included a mixed hard liquor and coke drink at 1700 hours, a two/three-shot rum and coke drink between 1900–1930 hours, and a two/three-shot rum and coke drink at 2100 hours. Specialist Tucker testified that between 0019–0230 hours the appellant had a strong odor of alcohol on his breath, was groggy

and sleepy, unable to walk without assistance, unable to answer simple questions coherently, too drunk to be questioned by Officer Salazar, and was placed in the D-cell at Fort Clayton because of his drunken condition.

Our holding on this assignment of error should not be interpreted to mean that military personnel stationed in a foreign country cannot or should not cooperate with their counterparts or officials of a foreign government during a criminal investigation involving a soldier, particularly when there may be a treaty obligation to do so. Our caution is that whenever a foreign official requires the assistance of military personnel to search a soldier in a United States military facility, the government must demonstrate that the assistance given was nothing more than mere presence, acting as an interpreter, or taking steps to mitigate property damage or personal injury as required by Mil.R.Evid. 311(c). Otherwise, the search must satisfy the Fourth Amendment as applied in the military community before the fruits of the search may be admitted into evidence in a trial by court-martial.

## II.

Concerning the government's failure to bring the appellant to trial within the time limits of R.C.M. 707, we agree with the facts as stated on the petition for extraordinary relief in *Porter v. Eggers*, 32 M.J. 583 (A.C.M.R.1990).[6] Various provisions of R.C.M. 707 germane to this issue, which were in effect at the time of trial, beginning with R.C.M. 707(a), provided:

*In general.* The accused shall be brought to trial within 120 days after the earlier of:

(1) Notice to the accused of preferral of charges under R.C.M. 308; or

(2) The imposition of restraint under R.C.M. 304(a)(2)–(4); or

(3) Entry on active duty under R.C.M. 204.

Relevant portions of R.C.M. 707(c) provided:

*Exclusions.* The following periods shall be excluded when determining whether the period in subsection (a) of this rule has run—

(1) Any periods of delay resulting from other proceedings in the case, including:

(A) Any examination into the mental capacity or responsibility of the accused;

(B) Any hearing on the capacity of the accused to stand trial ...;

(C) Any session on pretrial motions;

(D) Any appeal filed under R.C.M. 908 ...; and

(E) Any petition for extraordinary relief by either party.

. . . .

(3) Any period of delay resulting from a delay in a proceeding or a continuance in the court-martial granted at the request or with the consent of the defense.

. . . .

(6) Any period of delay resulting from the absence or unavailability of the accused.

■ The government's accountability began on 27 February 1990, the day after the appellant was notified of preferral of the charges, and ended temporarily on 19 July 1990, when the appellant was arraigned and pretrial motions heard, for a total of 143 days. From this period, the military judge excluded 55 days between 24 April and 19 June 1990 under R.C.M. 707(c)(1), because of another proceeding pertaining to this case that had prevented the government from going to trial after the appellant had been served with a copy of the referred charges. That proceeding was initiated by the appellant in the Panamanian court system on 14 March 1990 to contest the United States' request for waiver of Panamanian jurisdiction. Though not included in R.C.M. 707(c)(1), we hold the list of "other proceedings" is not exclusive and that the rule permits delays resulting from the kind of proceeding that the appellant initiated in Panamanian court to be excluded from the government's accountability. We also hold that the period could be excluded under

---

**6.** In the third numbered paragraph on page 585 of the opinion, appears the date when Operation Just Cause began—20 December 1990. The year in this date should be 1989.

R.C.M. 707(c)(6) due to the appellant's unavailability for court-martial. Until Panama waived jurisdiction on 18 June 1990, the appellant was not available for trial. Therefore, as of the arraignment, we find the government was responsible for only 88 of the 143 days.

Also at the arraignment on 19 July, the military judge denied the appellant's two motions asserting the government's lack of jurisdiction and failure to comply with R.C.M. 707. Thereafter, the military judge granted a stay in the proceedings to allow appellant to file a petition for extraordinary relief in the nature of a writ of mandamus, appealing both the jurisdictional and speedy trial issues. A decision on the petition for extraordinary relief was published on 28 December 1990.[7] Under R.C.M. 707(c)(1)(E), any period of delay resulting from a petition for extraordinary relief may be excluded.

The government's accountability resumed on 29 December 1990, for four days until 2 January 1991, when the appellant requested a delay until 20 February 1991, under R.C.M. 707(c)(3). The government finally presented evidence on the merits on 25 February 1991. Between 29 December 1990 and 25 February 1991, the government was responsible for nine additional days to bring its total accountable time to 97 days. We, therefore, hold that the military judge did not commit error in denying the appellant's motion to dismiss the charge because the government was successful in bringing the appellant to trial within the 120–day time limit of R.C.M. 707.

■ We have examined the ten errors personally raised by the appellant, including excessive sentence and ineffective assistance of counsel, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), and find that none warrant relief. On the basis of our review of the entire record, we are satisfied that the approved sentence was fair, appropriate, and not excessive. On the issue of ineffective assistance of the trial defense counsel, we have considered the appellant's sworn statement, affidavit of the defense counsel, as well as the entire record of trial, and we are convinced that the defense counsel's conduct was well within the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The findings of guilty and the sentence are affirmed.

Senior Judge CREAN and Judge WERNER concur.

---

7. *Porter v. Eggers,* 32 M.J. 583 (A.C.M.R.1990).